UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

-v-                                                                                        07-CR-986 (WHP)

RAUL BORBON and
JOHANS SANTATA,
                                    Defendants.
------------------------------------------------------------------X

## DEFENDANT BARBON'S FINDING OF FACTS AND CONCLUSION LAW

      Defendant Borbon, represented by counsel, James Michael Lenihan, defendant Santana, represented by counsel, Dawn Caridi, and the Government, represented by Assistant United States Attorney Benjamin Naftalis, all appearing before me on June 4, 2008 and June 13, 2008 for a Suppression Hearing and having considered the testimony adduced and the evidence admitted by the respective parties, and after due deliberation having been had thereon.

      NOW, after reading and considering the papers submitted, I do hereby make the following findings of essential facts which I deem established by the evidence.

### BACKGROUND

      On May 18, 2007, at approximately 10:30 p.m., NYPD Officers Crosas and Pedraza stopped, detained, and arrested defendant Johans Santana outside 2244 Creston Avenue, for trespassing. At approximately 11:00 p.m. that same night, after NYPD Officers Crosas and Maier illegally entered 2244 Creston Avenue Apartment 6B, defendant Raul Borbon's apartment, [hereinafter the "Apartment"] and discovered, *inter alia*, 166 marijuana plants growing in the bedroom and a gun in the hall closet. The Officers arrested Borbon and he was charged in a Bronx County information with possession of marijuana and possession of a gun. (Defendant's Exhibit "M").

On October 26, 2007, a Federal Grand Jury indicted Defendants Borbon and Santana in a single count indictment with violation of Title 21 U.S.C. §§ 812, 841(a)(1) and Title 18 U.S.C. § 2. Thereafter, Borbon filed pretrial motions requesting, *inter alia,* suppression of the evidence illegally seized from his apartment. Santana neither filed a motion nor joined in Borbon's motion. During a two day Suppressing Hearing, this Court heard testimony from both Defendants, NYPD Officer Kurt Maier, in addition to viewing numerous exhibits.

## *SUMMARY OF FACTS*

The testimony and the documents adduced during the hearing demonstrate that on the evening of May 18, 2007, acting pursuant to the "Clean Halls Program," NYPD Officers Crosas and Pedraza stopped and detained Defendant Johan Santana as he left 2244 Creston Avenue. (*See,* Suppression Hearing Transcripts, dated June 4, 2008 and June 13, 2008 (Tr.) at 105 L:14-15; 107 L:4-19; 111, L18-19).

After Santana informed the officers that he just came from his friend's Apartment 6B, Officer Pedraza detained Santana outside, while Officer Crosas proceeded inside 2244 Creston Avenue to Apartment 6B to verify Santana's claim. Officer Crosas talked to Borbon, verified Santana's claim, and left. (Tr.134 L:24-25 – 135 L:1- 6). At 10:47 p.m. that evening, Borbon telephoned Santana to inquire why a police officer came to his apartment. (Tr. 135 L:8-9).

At approximately 11:00 p.m. Officer Crosas returned to Borbon's apartment accompanied by Officer Kurt Maier. Both officers kicked and punched Borbon's apartment door until he opened it. (Tr.137 L:7-8 ). After telling the officers that he needed a minute to put his clothes on and would step outside to speak with them, Borbon open the door and attempted to step outside. At that point however, both officers physically forced Borbon back inside the apartment. (Tr.137 L:17-22).

After the officers illegally entered the apartment, they handcuffed Borbon and sat him on a cot in the foyer. Officer Maier conducted a safety sweep of the

apartment and discovered 166 marijuana plants growing in the bedroom[1] and a gun located in the hall closet, all in violation of the warrant requirement. (Tr.16 L:20-21; 17 L:23-24; 18 L:5-18; 152 L:16-19).

After Officer Maier completed his sweep he called his Lieutenant to come and assess the situation. While waiting for the Lieutenant to arrive Officer Maier and Officer Crosas, without first providing Miranda warnings, engaged Borbon in conversation that were designed to elicit incriminating statements. (Tr.19 L: 5-25; 20 L:1-24).

### *Missing Photographs*

Officer Maier testified that NYPD photographs were taken of Borbon's apartment. (Tr. 82 L:15-16). Borbon testified that he saw either the NYPD Supervisor or Officer Maier take pictures, but does not remember which one did. (Tr. 181 L:16-25; 182 L:1). Prior to the Suppression Hearing, defense counsel requested copies of all photographs taken of Borbon's apartment and the Government responded that no photos existed. Notwithstanding the Government's denials, it is uncontroverted that the NYPD took pictures of Borbon's apartment immediately following the officer's entry and search and have not provided the Defendant with copies.

### TESTIMONY OF RAUL BARBON

Defendant Borbon testified candidly about the offense. He admitted to possessing and growing the marijuana found in his apartment. In fact, during cross examination Borbon admitted to growing 178 marijuana plants, not 166 plants the NYPD logged into evidence. (Tr.163 L:14-17). He also admitted growing three unsuccessful batches prior to this batch. (Tr. 170 L: 9-23).

Borbon testified that on May 18, 2007 he resided at 2244 Creston Avenue, Apartment 6B, since May 2006, when he sublet the apartment from co-defendant Santana. (Tr.133 L:1-10). He also testified that he never let Santana know that he was growing marijuana in the apartment.

---

1 Defendant Borbon disputes the number of plants found, alleging 178 plants. See Testimony of Raul Borbon, *below*.

### *The First Police Encounter*

After meeting with Santana in the hallway of his apartment building, Borbon returned to his apartment. (Tr.135 L:1-2). At about 10:30 p.m., Borbon heard a knock at his door, looked through the peephole "and saw the police officer" who asked him "if a friend of mines [sic] had come to visit me." (Tr.134 L:6-9). Borbon opened the door, talked with the officer and confirmed that Santana was at his apartment. (Tr.134 L:10-16). Borbon described this officer as a "short, baldheaded, white." (Tr.134 L:19-21).

At 10:47 p.m. Borbon called Santana and "ask[ed] why the cop had come upstairs." (Tr. 135 L: 7-11; 108 L:1-12). *See also*, Defendant's Exhibit "O," Borbon's cell phone bill indicating his call to Santana's cell phone, 347-572-2432, at 10:47 p.m.

### *The Second Police Encounter*

Approximately 11:00 p.m., the bald officer returned to Borbon's apartment accompanied by NYPD Officer Kurt Maier. (Tr. 137 L:7-8). Both officers punched and kicked Borbon's door, demanding he open it. (Tr. 137 L:7-9). In response to their commands Borbon told the officers "[w]ait a minute, I have to put on my clothes and I will step outside and I will speak to you to see what the problem is." (Tr.137 L:9-11).

To prevent the officers from seeing inside his apartment, Borbon turned off the television and lights inside the apartment before he attempted to step into the hall and speak with the two officers. (Tr. 181 L:4-6 ; Tr.139 L:5 -25 - 140 L:1-7).

As a consequence of sleeping in the foyer, Borbon's cot restricted how far his door could open to not more than twenty inches. (Tr. 178 L: 20-21). As a result of this restriction, when Borbon opened the door to step into the hall he "opened it enough to get out. Not more not less, enough for my body to fit sideways out the door." (Tr.178 L:11-14).

As Borbon attempted to step into the hall, Officer Maier and the "baldheaded cop" pushed Borbon back into the apartment, handcuffed him, and sat him on his cot. (Tr. 141 L:19-23 ; Tr.137 L:17-22).

**The Apartment Interior**

Using Defendant's Exhibit "P," Borbon described the layout of his apartment when the officers illegally entered. (Tr. 146 L: 4-10). In the foyer, stacked against the wall long ways, were approximately seven 50 lb bags of Miracle-Gro. (Tr.161 L:22-25 162 L:1-3). In order to hide the Miracle-Gro from observation, (Tr. 181 L: 7-9), each bag was individually wrapped inside a black plastic bag. (Tr. 144 L:17-25 – 145 L:1-7).

To the left of the black plastic bags containing the Miracle-Gro were brown boxes, each three feet long by two and a half feet wide, stacked from the floor to the ceiling. (Tr. 145 L:15-25 – 146 L:1). Behind the brown boxes was a wall unit that had a TV and a VCR in it, (Tr. 138 L:11-14), paperback books on the top shelf and magazines placed to the left of the TV. The books and magazines were related to growing of marijuana. (Tr. 158 -160). There were also DVDs on the wall unit, some of which related to growing marijuana. (Tr. 138 L:11-14; 160 L:18-19).

Directly beyond the foyer was the living room. The living room was wrapped in black plastic from the floor to the ceiling and completely covered the room's entrance. (Tr. 138 L:15-17). To the right of the living room was the bedroom, with the bathroom at the end of the hallway and a closet directly opposite the bedroom. (Tr. 138 L:17-20).

**The Ventilation System**

In order to prevent the smell of marijuana from escaping the apartment, the Defendant installed a professional ventilation system, which ran 24-hours a day. The ventilation system consisted of approximately eight fans and vents running throughout the apartment that replaced the air inside the whole apartment every three to four minutes. (Tr. 164 -167; Tr. 147 L:14-20). In addition

there were six fans attached to the lighting system that also ran 24 hours a day. (Tr. L:12-25).

**Odorless Marijuana**

Defendant Borbon testified that the batch of marijuana the police seized was his fourth attempted batch, and that the specific seed used for this batch was the type that omitted very little odor, if any. (Tr. 170 L:14-23; Tr. 171 L: 3-5).

More importantly, in response to the Court's inquiry he testified that all of the 166 plants seized were just starting to flower; thus, these plants would not have omitted any odor at that time. (Tr. 170 L: 25; 184 L: 15-23).

## TESTIMONY OF JOHANS SANTANA

Assistant United States Attorney Naftalis interviewed Johans Santana prior to his testimony on June 13, 2008. Except for the direction in which the door to Borbon's apartment opens Santana's testimony is consistent with that interview.

Johans Santana testified that Apartment 6B was originally leased to him and his sister, prior to subletting it to Borbon in May 2006 (Tr. 102 L:17-19; 108 L:20-21).

On May 18, 2007, after speaking on the phone with Borbon, Santana was driven to Borbon's apartment at approximately 10:30 p.m. to borrow one hundred dollars. (T. 103 L:14-15). Borbon met Santana in the hallway, gave him a hundred dollars and the two chitchatted for about five or six minutes before Santana went back down stairs. (Tr. 104 L:14-22; 115 L:12-13).

Upon exiting the building, Santana was stopped by two NYPD officers; one officer was short and bald, the other approximately 5'11' and Italian looking. (Tr. 105 L:6 -15). Neither officer was Officer Maier. (Tr. 105 L:16-24). The bald officer patted Santana down and then asked him what he was doing there. Santana replied that he was visiting a friend in 6B. (Tr.107 L:5-7; 106 L:10-21). While Santana was detained in his friend's car by the "Italian looking officer," the bald officer went into the building. (Tr. 107 L:6-8).

A few minutes after the bald officer entered the building, Santana received a phone call from Borbon asking what was going on. (Tr.108 L:1-2). Santana told Borbon "there's an officer was going upstairs to ask you if I was there." Borbon replied that the officer came and verified that Santana was at the apartment. (Tr.108 L:9-12).

The bald officer returned to the car where Santana was being detained, searched Santana again and re-entered the building a second time. (Tr. 109 L:23-25; 110 L:1-8). After receiving a radio call, the "Italian looking officer" removed Santana from the car, handcuffed him, and placed him in the police car. (Tr. 111 L: 2-21). Santana was arrested by Officer Maier and charged with Criminal Trespassing. These charges were ultimately dismissed. (Tr. 112 L: 14-19).

### TESTIMONY OF NYPD OFFICER KURT MAIER

Police Officer Kurt Maier testified that prior to joining the NYPD he was a member of the United States Army's Green Beret unit. (Tr. 6 L:9-15). During his tenure in the Green Beret he was deployed overseas numerous times, (Tr. 24 L:3-21), with deployments to Afghanistan and Iraq. During deployments Officer Maier conducted operations that included premises searches. (Tr. 26 L:1-3).

According to Maier at approximately 10:30 p.m., pursuant to the Clean Halls Program, NYPD officers Maier, Crosas, and Pedraza[2] stopped Santana as he came out of 2244 Creston to verify either if he lived in the building or where he was coming from and who he was visiting. (Tr. 8 L:5-13). Santana stated that he was visiting a friend in Apartment 6B. (Tr.9 L:4-9).

Maier testified that after speaking with Santana, Maier and Crosas went to Apartment 6B to confirm Santana's information, while Officer Pedraza detained Santana. (Tr.9 L:14-25 - 10 L:1-4). According to Officer Maier their walk to the apartment took approximately four to five minutes. (Tr. 30 L:7-9).

---

2 Officer Crosas is the bald or baldheaded officer as described by both Defendants (Tr. 105 L:13 -15 ; 134 L:19-21), and Officer Pedraza is the Italian looking officer as described by Santana. (Tr. 105 L:13 -15).

Upon arriving on the sixth floor Officer Maier allegedly encountered an elderly man who lived in the apartment that adjoined Borbon's. The man told Maier that drugs where being produced or cooked in Apartment 6B. (Tr. 10 L:11-25 - 11 L:1-11). This conversation took about a minute. (Tr. 11 L:17-18 ). Maier testified that while on the sixth floor he could smell the odor of marijuana. (Tr.11 L:19-21).

Officer Maier testified that he knocked on the door to Apartment 6B and with the door closed the officers identified themselves and asked if someone visited him. (Tr. 12 L:21-25 - 3 L:1). Borbon took a couple minutes to answer the door. (Tr. 12 L: 18-20).

First, Officer Maier testified that Borbon opened the door "approximately halfway open, wide enough to see inside and see his full figure." (Tr. 33 L: 9-10). Later he changed his testimony and stated that Borbon was standing sideways when he opened the door and made no attempt to block his vision inside the apartment. (Tr. 33 L:19-24). According to Maier, from the time the door was open until he entered the apartment, only one to two minutes elapsed. (Tr. 16 L:13-15).

**Maier's Testimony Regarding the Inside of the Apartment**

According to Maier, when Borbon opened the door, Officer Maier, while still outside the apartment, observed in plain view, marijuana plants "[s]itting right next to the door, [ ] in black little bodega bags," (Tr. 33 L:25 -34 L:1-7); Miracle-Gro bags stacked up against the wall,(Tr. 42 L:15-16); a cot; an entertainment cabinet with a television, books, magazines, and VCR tapes. (Tr. 14 L: 20-23).

Officer Maier testified that once inside the apartment, conducted a safety sweep during which he observed plastic sheathing that closed off the living room and metal aluminum duck work running the length of the floor, (Tr. 14 L:24-25 – 15 L:1-2). Inside the bedroom he observed 144 marijuana plants and a fully automated growing, lighting, watering, and ventilation system, (Tr. 17 L: 23-24), and with the hall closet allegedly open, Officer Maier saw on a shelf a black plastic bag wrapped around something with an L-shape which appeared to be a pistol. (Tr. 18 L:13-15). The safety sweep took less than a minute, (Tr. 17 L:5-6).

### *After The Safety Sweep*

After completing his safety sweep, Officer Maier called his Lieutenant to come and assess the situation. Prior to the Lieutenant's arrival, however, Officer Maier handcuffed Borbon, sat him on the cot, and without first Mirandizing him, both Officers Maier and Corsas engaged Borbon in conversations that were designed to elicited incriminating statements. (Tr.19 L:13-25 – 20 L:1-24). The Lieutenant arrived ten minutes after Maier called. He assessed the situation, froze the location, and instructed the officers to draw up emergency search warrants. The Officers had Borbon removed from the apartment to the precinct. (Tr. 21 L:12-18).

### *Borbon's Phone Call*

Officer Maier testified that Borbon was under constant NYPD watch from the time he answered the door, (Tr. 63 L: 18-22), and since Borbon was handcuffed behind his back and it was unlikely he would have been able to make a phone call. Maier did not recall Borbon making a phone call. (Tr. 64 L: 22-25 – 65 L:1-14).

### *Santana's Trespass*

Officer Maier testified that the reason for going upstairs initially was to determine whether or not Santana was trespassing and, (Tr. 45 L:24-25 – 46 L:1-2), that thereafter because Borbon was unresponsive to his questions and he could not establish if Santana was in fact at Borbon's apartment, he arrested Santana for criminal trespass. (Tr. 47 L:16-25 – 49 L:1-7).  (*See also*, Defendant's Exhibit "M," Bronx County Criminal Complaint.)

### **Government Discovery**

Officer Maier testified that when Borbon opened the door he saw, in plain view, little black bodega bags containing marijuana plants. (Tr. 33 L:25 -34 L:1-7). However, after Officer Maier reviewed the transmittal of evidence forms that he signed and filed in this case, (Defendant's Exhibits "A – J"), and after he reviewed the accusatory instrument filed with the Bronx Supreme Court, (Defendant's Exhibit

"M"), Officer Maier admitted that his arrest and evidence documents contained no "little black bodega bags with marijuana" in any of the exhibits. (Tr. 54 L: 1 – 63 L;8)

## FACTUAL ARGUMENT

Defendant Borbon avers that in order for the Court to uphold this warrantless entry and illegal search of Borbon's apartment by the NYPD, the Court must **completely discredit** the testimony of defendants Santana and Borbon, which **is supported** by documentary evidence and completely **credit** the testimony of Officer Maier, which **is unsupported** by documentary evidence.

Defendant avers that Officer Maier's testimony is completely at odds with both the testimony of Borbon and Santana and the documentary evidence on the critical issues in this matter.

Police Officer Maier testified that at approximately 10:30 p.m., he and NYPD Officers Crosas and Pedraza stopped Santana as he came out of 2244 Creston Avenue to verify if he lived in the building,(Tr. 8 L:5-13), and Santana stated that he was visiting a friend in Apartment 6B. (Tr.9 L:4-9). In contrast, Santana testified that he was stopped by **two** NYPD officers, one officer short and bald, the other 5'11' Italian looking, (Tr. 105 L:6 -15), and **neither** officer was Officer Maier. (Tr. 105 L:16-24).

Officer Maier testified that he and Officer Crosas went to Apartment 6B to confirm Santana's information, while Officer Pedraza detained Santana. (Tr.9 L:14-25 - 10 L:1-4). Both Santana and Borbon contradict this portion Officer Maier's testimony. Santana states that after informing the officers that he was visiting a friend in 6B, the bald officer went into the building to verify his story. (Tr.107 L:5-8; 106 L:10-21).

Officer Maier testified that he knew of no other NYPD officer that went to Borbon's apartment on the night of May 18, 2006. He also testified that when he and Officer Crosas arrived at Apartment 6B, he knocked on the door and with the

door closed the officers identified themselves and asked if someone visited him. (Tr. 12 L:21-25 - 3 L:1).

Borbon testified that about 10:30 p.m. he heard a knock at his door, looked through the peephole "and saw the police officer" who asked him "if a friend of mines [sic] had come to visit me." (Tr.134 L:6-9). Borbon opened the door, talked with the officer and confirmed that Santana was at his apartment. Borbon described this officer as a "short, baldheaded, white." (Tr.134 L:10-21).

Officer Maier first testifies that Borbon opened the door "approximately halfway open, wide enough to see inside and see his full figure." (Tr. 33 L: 9-10). Later, he changed his testimony and stated that Borbon was standing sideways when he opened the door and made no attempt to block his vision inside the apartment (Tr. 33 L:19-24).

Borbon's version of events is different. He testified that his door could not open fully because of the cot in the foyer (Tr. 178 L: 20-21), and as a result when he opened the door to step into the hall he "opened it enough to get out. Not more not less, enough for my body to fit sideways out the door." (Tr.178 L:11-14). It is clear from the testimony of both Officer Maier and Borbon that when Borbon tried to step out of the apartment he was turned sideways. This fact belies the rest of Officers Maier's testimony about what he saw from the apartment entrance.

Borbon, Santana and Defendant's Exhibit "O" clearly indicate that Borbon made a telephone call to Santana at a time which, according to P.O. Maier's testimony, Borbon was handcuffed behind his back and under the watch of the NYPD (Tr. 63 L:18-22; 64 L:22-25 – 65 L:1-14).

Police Officer Maier's testimony that probable cause to enter the Apartment was obtained by the presence of contraband in plain view, to wit: black plastic bags of marijuana plants in the open doorway is unsubstantiated by documentary evidence. Since the marijuana in the doorway is contraband for which probable cause was based, the absence of any documentary evidence, or "evidence transmittal documents," as to the existence of the contraband allegedly

found in the doorway, belies probable cause. Defendant's Exhibit "A – J," the Government's discovery provided to Defendant, are devoid of any such evidence. The Government introduced no documents to verify Maier's contention; thus, it is reasonable to believe that no such evidence exists.

Police Officer Maier's testimony that probable cause to enter the Apartment was obtained by the presence of contraband in plain view, to wit: DVDs, books, and magazines which were not only clearly **visible**, but according to Maier's testimony were **legible** from the hallway which enabled him to actually read the spines of the DVD's , books and magazines, (Tr. 67 L:15-18), is controverted by testimony adduced from Borbon, who indicated that he turned off the television and all the lights so that there was no light in the apartment (Tr. 181 L:4-6; Tr. 139 L:5 -140 L:7) and that the stacked boxes precluded visibility of the entertainment unit which contained the DVDs books and magazines in question. (Tr.138 L: 11-14 ; Tr. 179 L:21-25).

In addition, P.O. Maier testified that the Miracle-Gro which Defendant admitted was stacked in the foyer, was plainly visible, while the Defendant testified that the Miracle-Gro was concealed in black plastic bags from the time he took it into the building, to avoid both detection and suspicion. (Tr. 181 L: 7-9; 144 L:17– 145 L:7). The absence of photographs which were admittedly taken by the NYPD of this physical evidence, yet never produced to the Government or the Defendant, tends to discredit the testimony provided by the Government.

Police Officer Maier's testimony that probable cause to enter the Apartment was obtained by the presence of contraband in plain view, to wit: the presence of the smell of marijuana in the hallway is contradicted by both Maier's testimony that there existed a professional setup (Tr. 20 L: 23-24) and ventilation system to ventilate the smell of marijuana away from the front of the apartment that the Defendant admits was virtually a marijuana factory.  Additionally, upon inquiry from the Court, Defendant testified that in addition to the fact that the seeds used to germinate this crop of marijuana were those designed to omit

"very little odor" when flowering, (Tr. 170 L: 14-23; 171 L:3-5) and that flowering has just begun (Tr. 170 L: 25; 184 L15-23) belies the Government's proof.

**LEGAL ARGUMENT**

The legal question for the Court is two fold: (1) if the Court finds the testimony of the Defendants and the supporting evidentiary documentation credible, then it must concluded that there were two trips to Borbon's apartment; thus, no exigent circumstance existed and the Court must suppress the evidence seized in Borbon's apartment, *Wong Sun v U.S.*, 371 U.S. 471 (1963); and (2) if, and only if, the Court discredits the testimony and supporting documentation with regard to the Borbon's first encounter with the police, then Court must determine whether the evidence adduced with regard to the exigent circumstances exception to the exclusionary rule, under a plain-view theory, supports the warrantless entry into Borbon's apartment. *Payton v. New York,* 445 U.S. 573 (1980).

**The Two Visit Analysis**

If the NYPD officers approached Borbon's apartment twice, then exigent circumstances could not have existed at the time Officers Maier and Corsas made their warrantless entry on the second visit. *Payton v. New York,* 445 U.S. 573, 587-588 (1980). (Even if officers have probable cause to believe incriminating evidence will be found "absent exigent circumstances" a warrantless entry is unconstitutional.) See also, *Mincey v. Arizona,* 437 U.S. 385, 393-394 (1978) ("[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.") and the evidence seized from the Defendant's apartment must be suppressed. *Wong Sun. v U.S.*, 371 U.S. 471.

Under this analysis, there is no plausible reason for the officers not to obtain a warrant before their return to the apartment. After learning that Santana had visited Borbon, Officer Crosas left the apartment and any subsequent visit mandated a warrant and vitiated any exigency under the facts in this case.

*United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990) (*en banc*) (*quoting Dorman v. United States*, 435 F.2d 385, 391 (D.C. Cir. 1970).

### One Visit Analysis

If Officers Maier and Crosas approached Borbon's apartment once, then the Court must determine if Officer Maier demonstrated that exigent circumstances existed **prior** to the Officers' warrantless entry. *See, Welsh v. Wisconsin,* 466 U.S. 740, 749-50, 104 S.Ct. 2091 (1984) (The government bears the burden of demonstrating exigent circumstances that overcome their presumptively unreasonable entry).

The Government's argument that Officers Maier and Crosas went to Borbon's apartment and after Borbon opened his door Officer Maier saw incriminating evidence in plain view is unsupported by the evidence; thus failing to over come the presumptively unreasonable entry.

The only evidence offered by the Government to support their claim of exigent circumstances was Officer Maier's testimony. His testimony however, has been discredited by either documents or other testimony. Officer Maier's testimony that black plastic bags of marijuana plants were in the open doorway was disproved by NYPD documentary evidence. (See, Defendant's Exhibit "A-J") His testimony that he saw and read the spines of DVDs, books, and magazines from the hallway was controverted by Borbon's testimony that he turned off the television and all the lights so that there was no light in the apartment when he opened door and that the stacked boxes precluded visibility of the entertainment unit which contained the DVDs books and magazines in question. Maier's testimony that the Miracle-Gro bags were plainly visible is again discredited by the Defendant testimony that the Miracle-Gro was concealed in black plastic bags from the time he took it into the building, to avoid both detection and suspicion.

Moreover, the only evidence "whose incriminating character was immediately apparent" was the contraband allegedly in the door way in little black bodega bags. While it is arguable that this evidence comports with the

requirements of *Coolidge v. New Hampshire,* 403 U.S. 443 (1971), there is no documentary evidence to substantiate the actual existence of this contraband; thus, there is no documentary evidence that this contraband ever existed.

Where objects were obviously in plain view, but their incriminating character was not immediately apparent, and their probative value remained uncertain until the interior was swept, those items can not constitute probable cause. *See, e.g., Horton v. California,* 496 U.S. 128 (1990) (*quoting Coolidge v. New Hampshire,* 403 U.S. 443.)

In the instant case all of the non-contraband items in plain view of Officer Maier had no incriminating character. Thus, only after Maier conducted his "protective sweep" and found the growing marijuana in the bedroom was the probative value and the incriminating nature of the Miracle-Gro, DVDs and other non-contraband items ascertained. Without knowing that marijuana was growing in the bedroom, these items had no import and could not establish probable cause.

Despite uncontroverted testimony from both sides that crime scene photographs which would either support or discredit the Government's argument were taken at the scene, but not provided to either the Government or the Defendants, leaves a vacuum of proof as to these contentions. Thus, the court must rely on the credibility of the witness' testimony.

**CONCLUSION**

From the forgoing the Court should grant defendant, RAUL BORBON'S pretrial motions.

Dated: WHITE PLAINS, NY
August 7, 2008

Respectfully Submitted,

James Michael Lenihan
Attorney for Defendant Raul Borbon
235 Main Street
White Plains, NY 10502